UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

UNITED STATES OF AMERICA

v.

Case No.: 3:23cr14

TREVON DERWIN RECTOR,

    Defendant.

## DEFENDANT TREVON DERWIN RECTOR'S SENTENCING MEMORANDUM

The Defendant, Trevon Derwin Rector ("Mr. Rector"), by counsel, pursuant to this Court's Presentencing Order, Rule 32(i) of the Federal Rules of Criminal Procedure, and 18 U.S.C. § 3553(a), submits the following Sentencing Memorandum. For the reasons outlined, Mr. Rector moves for a downward departure or variance. To impose a sentence sufficient but not greater than necessary to achieve the goals of sentencing, we ask that the Court impose a term of imprisonment of no more than eighty-four (84) months; a term of supervised release of four (4) years; and adhere to the mandatory, standard, and special conditions outlined in the Presentence Investigation Report ("PSR").

Pursuant to a written Plea Agreement, on November 3, 2023, Mr. Rector pled guilty to: A lesser included offense of Count 1, conspiracy to distribute and possession with intent to distribute 40 grams or more of Fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846; Count 3, possession with the intent to distribute 40 grams or more of Fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B); and Count 5, possessing a firearm after having been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1).

{01433874-13 }

A PSR has been completed. As currently calculated the advisory Sentencing Guidelines range is one-hundred and eight (108) months to one-hundred and thirty-five (135) months' imprisonment based on a total offense level of twenty-nine (29) and a criminal history category of III. As part of the calculation, Mr. Rector received the maximum credit under the Guidelines for fully accepting responsibility.

The record in this case provides the Court with ample evidence for a downward departure or variance. The Government's sentencing position wholly ignores Mr. Rector's background and how he arrived at this point in his life. The government brushes past the mitigating circumstances that this Court must consider in imposing a sentence sufficient but not greater than necessary. In fact, a mitigating explanation exists for the trajectory of Mr. Rector's life. In fashioning its sentence, this Court should punish Mr. Rector, but also account for his traumatic background and the lack of meaningful intervention. Mr. Rector is living proof that harsh and lengthy sentences often fail to address the causes of criminal conduct – and, especially in young people, have proved largely ineffective at preventing recidivism.

## **BACKGROUND**

Mr. Rector comes before the Court at age 27, having spent almost a third of his life incarcerated. Like many young men in his circumstances, his path was tragic: a chaotic and abusive household led him onto the streets and into jail. There is no ignoring that Mr. Rector's prior criminal record presents a troubling aspect of his background and character. But as a man in his late twenties, Mr. Rector stands at a crossroads. He will emerge from federal prison either with a new attitude or remain on the same path and throw his life away. We hope the Court will consider – and find mitigating – how and why Mr. Rector ended up where he is today. Through its sentence, the Court should send a message not only that Mr. Rector requires punishment, but

also that Mr. Rector can be rehabilitated and salvage his life. A sentence of no more than eighty-four (84) months will return Mr. Rector to the community in his mid-thirties, better equipped to successfully assimilate into society. Such a term of imprisonment is more than sufficient to remove Mr. Rector from society and to provide him with the rehabilitative resources available in prison. Mr. Rector will then be subject to a significant period of supervised release, which will further assist with his rehabilitation and reintegration into the community.

Mr. Rector's formative years as a teenager and young adult proved extremely harmful and damaging. His parents provided virtually no support, guidance, or discipline. Instead, during those critical years Mr. Rector experienced profound loss, abuse, and rejection. His father committed suicide when Mr. Rector was four years old. A *Washington Post* article from 2001, attached as Exhibit 1, contains the horrific details surrounding his father's death.[1] Then only 23 years old, Mr. Rector's father hanged himself using bedsheets in his jail cell while incarcerated in Fauquier County. The effect of this devastating loss on Mr. Rector is discussed more fully below. Before and after this tragedy, Mr. Rector's mother failed to provide the support and love he desperately needed, ultimately choosing her abusive boyfriend over her son. At roughly 16 years old, Mr. Rector found himself homeless until arrested at age 17 for his involvement in a robbery. He spent a few months in the Loudon County Juvenile Detention Center, where Mr. Rector was able to obtain his GED. He did not spend sufficient time in any juvenile correction facility to benefit from programs tailored to meet his needs.

Though still a juvenile with no prior criminal history, Mr. Rector's case was nonetheless certified to the circuit court, and he was transferred to the Prince William County Jail, an adult facility. Mr. Rector was tried and sentenced as an adult and transferred again to the Indian Creek

---

[1] The article can also be accessed at https://www.washingtonpost.com/archive/local/2001/02/01/county-inmate-found-hanging-in-his-cell/5c2f4f36-7923-4b08-882b-d7f72e7fa7ab/.

{01433874-13}                                      3

Correctional Center, an adult prison. The circuit court ordered Mr. Rector to participate in Virginia's Youthful Offender program – which purports to include military style drill, cognitive behavioral restructuring, life skills and education. *See* Virginia Code § 53.1-63. In reality Mr. Rector still young and vulnerable was incarcerated at Indian Creek with adult offenders serving lengthy sentences for serious violent crimes – and with virtually no services available to address any underlying psychological problems or prepare him for release. In a prison dominated by gangs, Mr. Rector did what it took to survive. As explained below, treating juveniles as adults within the justice system is now largely condemned, as doing so produces devastating consequences for the individual and society writ large.

To provide the Court with additional insight into Mr. Rector's background and character, we are attaching letters from friends and family as Exhibits 2 through 12. In addition to the reported abuse and neglect contained in the PSR, the writers further document Mr. Rector's harsh childhood and upbringing. They describe his chaotic family life, the loss of his father to suicide, and the absence of maternal support and care. Notwithstanding his tragic circumstances, those closest to him believe Mr. Rector can learn and grow into a responsible and productive citizen. Stephen A. Foster, Sr. ("Mr. Foster") is 76 years old and knows Mr. Rector and Mr. Rector's grandfather. Mr. Foster is aware of the difficulties Mr. Rector faced as a directionless youth and believes Mr. Rector "finally matured enough to accept direction." Mr. Foster feels Mr. Rector "will become a[n] outstanding young man, if given the opportunity." Mr. Foster's uncle, Trent Phillips, recognizes that Mr. Rector "has not had a very good childhood due to being raised in a broken home, as this unfortunate situation put him at a disadvantage from day one by not having the proper guidance early in his life."

Mr. Rector's cousin, Katrina Mosley ("Ms. K. Mosley") recognizes Mr. Rector's rough upbringing, including the suicide of his father. Ms. K. Mosley writes in her letter: "Unlike recent times, mental illness was not recognized the way it is now. It resulted in [Mr. Rector's father's] early death by suicide. That left [Mr. Rector] with an unprotected childhood with deep feelings of abandonment and misguided direction from his youth." Ms. K. Mosley knows that Mr. Rector's charges are not reflective of who he really is. "If you've had a chance to speak to him I know you see that his demeanor does not fit the descriptions of charges. He's kind. Respectful even, and full of regret for his choices."  Mr. Rector's aunt, Marlene Tibbs, has known Mr. Rector his entire life. She knew him to be a "loving and compassionate child" and she still believes he possesses these qualities. She emphasizes the "loving family ready to support him in building a new life."

Another aunt who has also known Mr. Rector his whole life, Deborah Phillips, echoes the strong family ties, as the family all lives side-by-side in Warrenton. She knows Mr. Rector to be "respectful and polite."  More family support comes from Mr. Rector's other cousin, Nataiya Mosely ("Ms. N. Mosley"). Ms. N. Mosley has seen how Mr. Rector "consistently displayed qualities of kindness, responsibility, and integrity" throughout his life. She also emphasizes the supportive network, including a "plethora of supportive cousins," available to help Mr. Rector.

Mr. Rector's grandfather, Ronald Rector ("Mr. R. Rector") cares for him deeply and is willing to do whatever is required to assist Mr. Rector. Mr. R. Rector is retired after a 37-year career with Columbia Gas, and currently drives a school bus in Warrenton. He knows Mr. Rector to be "an altruistic person, he's been that way all his life, he feels responsible, especially toward his family, (his mother, sister, and brother). It's somet[hing] innate in him that make him feel

obligated, even at his own expense." Mr. R. Rector is willing to house his grandson and help him gain employment.

While they document the deprivations of his earlier life, all the writers also see good in Mr. Rector. They know he can do better. Marlene Tibbs has confidence that he "will turn his life around." Stephen Foster observes that "Trevon has finally matured enough to accept direction." Deborah Phillips describes interactions with Mr. Rector at her house and says he was "always respectful and polite." Mr. Rector's cousin, Nataiya Mosley, says that he is a great cousin and appreciates his "bubbly personality and ability to put a smile on anyone's face."

Given these observations and the other evidence, we ask the Court to depart or vary downward to impose a sentence sufficient to provide Mr. Rector with an opportunity to redeem himself. Mr. Rector has been fighting against the odds his whole life. While it is indisputable that the aims of sentencing require punishment and that the Court must avoid unwarranted sentencing disparities, the other factors including Mr. Rector's background and the need for rehabilitation, weigh heavily in favor of a downward departure or variance.

## ARGUMENT

### I. Applicable sentencing law.

After *United States v. Booker*, 543 U.S. 220 (2005), the Federal Sentencing Guidelines are advisory, and Courts of Appeals review sentences for reasonableness. *See United States v. Hughes*, 401 F.3d 540, 546-47 (4th Cir. 2005). In *Rita v. United States,* 551 U.S. 338, 347-48 (2007), the Supreme Court held that a district court should begin all sentencing proceedings by correctly calculating the applicable Guideline range. The district court must then consider the factors listed in 18 U.S.C. § 3553(a) and determine if they support the sentence requested by a party. "In so doing, [the sentencing judge] may not presume that the Guidelines range is

reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007) (citing *Rita*, 551 U.S. at 351). "It has been uniform and constant in the federal judicial tradition for the sentencing judge *to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate*, sometimes magnify, the crime and the punishment to ensue." *Concepcion v. United States*, 142 S. Ct. 2389, 2399 (2022) (citing *Koon v. United States*, 518 U.S. 81, 113 (1996) (emphasis added).

Indeed, the Court in *Gall* rejected a rule that required "extraordinary circumstances" be found to impose a sentence outside of the Guidelines. 552 U.S. at 47. Such a requirement impermissibly applies "a heightened standard of review to sentences outside the Guidelines range. This is inconsistent with the rule that the abuse-of-discretion standard of review applies to appellate review of all sentencing decisions." *Id.* at 49. "Although the Guidelines range is one of the factors that courts must consider at sentencing, judges need not give the Guidelines range any particular weight." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1914 (2018) (internal citation omitted). District courts may therefore disagree with the Guidelines range, and "may in appropriate cases impose a non-Guidelines sentence based on a disagreement with the Commission's views." *Pepper v. United States*, 562 U.S. 476, 501 (2011) (citing *Kimbrough v. United States*, 552 U.S. 85, 109-110 (2007)). *See also Chavez-Meza v. United States*, 138 S. Ct. 1959, 1963 (2018) (noting that a court "has the legal authority to impose a sentence outside the range either because [it] 'departs' from the range (as is permitted by certain Guidelines rules) or because [it] chooses to 'vary' from the Guidelines by not applying them at all").

Variances provide an important tool in applying the appropriate, individualized sentence for a particular case. As Justice Stevens observed, "[t]he Commission has not developed any standards or recommendations that affect sentencing ranges for many individual characteristics.

Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civic, charitable, or public service are not ordinarily considered under the Guidelines. These are, however, matters that § 3553(a) authorizes the sentencing judge to consider." *Rita*, 551 U.S. at 364-65 (Stevens, J., concurring).

In addition to the advisory Guidelines range, the statutory factors that must be considered in determining a just sentence include: the nature and circumstances of the offense and the history and characteristics of the defendant, 18 U.S.C. § 3553(a)(1); the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and provide the defendant with appropriate correctional treatment, *id.* at § 3553(a)(2); the kinds of sentences available, *id.* at 3553(a)(3); the need to avoid unwarranted disparity among defendants with similar records and conduct, *id.* at § 3553(a)(6); and the need to provide any restitution to any victims of the offense, *id.* at § 3553(a)(7). The primary directive of § 3553(a), of course, is to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.

**II.    The § 3553(a) factors.**

  *A.    The nature and circumstances of the offense and background and character of the defendant.*

The serious conduct is described in detail in the statement of facts, recounted in Paragraphs 4-17 of the PSR. Without diminishing the seriousness of the fentanyl crisis to which Mr. Rector and his co-defendant contributed, it should be noted that there is nothing aggravating about Mr. Rector's conduct beyond the offenses charged. There is no evidence that Mr. Rector resorted to violence or threats of violence in the distribution of drugs or that he was a leader or organizer in any drug distribution effort. The weapon found in the car on the date of

Mr. Rector's arrest belonged to his co-defendant, who obtained fentanyl from a source in Texas. ECF No. 75 at 2. On the date of the buy-bust operation, Mr. Rector was peacefully taken into custody. There is no evidence that he obstructed justice or that he has attempted to continue his criminal conduct following his incarceration. Mr. Rector pled guilty early in the proceedings and accepted responsibility for his conduct. In sum, he committed the crime for which he was charged, but no more. No additional, aggravating factors require a more significant punishment. While the Court must consider the nature and circumstances of the offense, in Mr. Rector's case, the Court should not rest its sentencing decision largely on this factor.

Nor should the Court rest its sentencing decision largely on the most negative aspect of Mr. Rector's background and character – his prior criminal conduct. Sadly, Mr. Rector has spent most of his life incarcerated. But Mr. Rector's involvement in criminal conduct did not begin in a vacuum. As documented in the PSR, when he was in seventh grade, Mr. Rector's mother kicked him out of the house because of tensions between Mr. Rector and his stepfather. Not surprisingly, Mr. Rector dropped out of school. At 17, Mr. Rector was charged with robbery and was initially housed in a juvenile detention facility. In a practice that has been largely condemned and mostly eliminated, Mr. Rector was certified to the circuit court and he was tried and sentenced as an adult. On January 16, 2014, he went to an adult prison, just a few months after he turned 18, where he spent the most formative years of his life as a young adult.

The Youthful Offender Program, to which he received an indeterminate sentence, provided no one-on-one counselling or mental health treatment. In reality, Indian Creek provided no specialized programming to assist someone like Mr. Rector. Instead, he found himself serving hard time alongside older offenders and gang members in prison for serious crimes. When Mr. Rector allegedly violated the conditions of the Youthful Offender Program

(the "probation violation" the Government references in its Memorandum), he was returned to the circuit court. There, his attorney made a plea for release from prison, and asked the court to place him on probation rather than impose additional incarceration. At the hearing, a qualified expert testified regarding this pivotal moment in Mr. Rector's life. She opined that Mr. Rector had experienced significant trauma, that he required mental health treatment, and that sending him back to prison would be counterproductive. Dr. Sarah Boyd, a clinical psychologist, opined that *with proper intervention*, Mr. Rector was no more likely to reoffend than most juveniles. She cited studies confirming that probation effectively addresses recidivism in juveniles and young people. The Court nevertheless imposed additional prison time and Mr. Rector remained incarcerated without the benefit of services until his release in December of 2021. A copy of Dr. Boyd's testimony is attached as Exhibit 13.

To be clear, this Memorandum should not be read as an effort to shift blame away from Mr. Rector. Mr. Rector must take responsibility for his actions in this case. But it is important to consider Mr. Rector's surroundings and the failures of a system of which Mr. Rector is a product. The Court should measure Mr. Rector's criminal history against the system's failure to truly rehabilitate youthful offenders. Despite his youth and vulnerabilities, Mr. Rector was tried and sentenced as an adult, during a time which favored transferring juveniles to adult court. The practice failed and has been largely abandoned. Studies have found that young adults are more likely to reoffend and return to prison when they went through the adult system. *See e.g.*, Matthew R. Durose, Alexia D. Cooper, and Howard N. Snyder, *Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010*, U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics (2014) (finding that approximately 76 percent of

people who were under the age of 25 when released from prison were rearrested within three years, and 84 percent were rearrested within five years).[2]

In addition, during his incarceration, Mr. Rector lacked family engagement and became disconnected from his community. Family engagement and community connections significantly contribute to the success or failure of re-entry into the community. *Virginia's Juvenile Justice System,* December 13, 2021, Joint Legislative Audit and Review Commission's Report to the Governor and the General Assembly of Virginia, at 97.[3] This is why the statements of current support by his grandfather and other close relatives are so important to his rehabilitation. Mr. Rector truly finds himself at a crossroads. He will either continue down the road of self-destruction and spend his adult life in prison, or he will emerge from this experience a stronger mature man. Mr. Rector has expressed his desire to learn a trade. He knows he must move beyond his traumatic past. He understands he must be accountable for his actions. A sentence of not more than eighty-four (84) months is sufficient but not greater than necessary to punish someone who has never spent time in a federal prison, and to simultaneously encourage Mr. Rector's belief that he can change.

The Court should consider Mr. Rector's other history and characteristics as mitigating and should view the traumas of his early life as justification for a downward departure or variance. The PSR details his history of abuse and neglect as a child (PSR ¶¶ 46-48, 54, 56) and as an adult (PSR ¶¶ 49-50, 53, 57-59). The letters written on Mr. Rector's behalf address his chaotic childhood and the loss of his father to suicide. Mr. Rector struggles to this day with his father's self-inflicted death. During the interview with probation, Mr. Rector was reduced to tears just talking about how he learned on his tenth birthday that his father had taken his own

---

[2] *Available at* https://bjs.ojp.gov/content/pub/pdf/rprts05p0510.pdf.
[3] *Available at* https://jlarc.virginia.gov/pdfs/reports/Rpt558-2.pdf.

{01433874-13 }                                                11

life six years earlier.

The trauma caused by a parent's suicide is profound. *See* Cortland Watson, et al., *Very Young Child Survivors' Perceptions of Their Father's Suicide: Exploring Bibliotherapy as Postvention Support*, INT. J. ENVIRON. RES. PUB. HEALTH, 18(21):11384 (2021).[4] Even under the best of circumstances with appropriate intervention and support, the study above concluded that "[t]he majority of participants . . . described the continued confusion as they observed the extreme emotional reactions of the adults. They reported not understanding what had happened." *Id*. With limited memories of his father, and the harsh stigma surrounding suicide, Mr. Rector faced an extremely traumatic and complicated grieving process. "For surviving children, a parent's death triggers both short- and long-term physical, emotional, behavioral, and mental health challenges." *Id.* Experts also agree that children whose parent dies by suicide are more likely to suffer from mental illness or even die by suicide themselves. Of a study on the topic conducted by Johns Hopkins researchers, lead investigator Holly C. Wilcox, Ph.D., a psychiatric epidemiologist said: "Losing a parent to suicide at an early age emerges as a catalyst for suicide and psychiatric disorders . . . However, it's likely that developmental, environmental, and genetic factors all come together, most likely simultaneously, to increase risk." *See Children Who Lose A Parent to Suicide More Likely To Die the Same Way.*[5] The researchers also found that "[l]osing a parent, regardless of cause, increased a child's risk of committing a violent crime." *Id.*

Mr. Rector's family express a commitment to helping him finally come to terms with these devastating aspects of his youth. The extreme circumstances of his upbringing provide the Court with a basis for varying downward, as does the prospect that Mr. Rector will finally

---

[4] *Available at* https://www.mdpi.com/1660-4601/18/21/11384.
[5] *Available at* https://www.hopkinsmedicine.org/news/media/releases/children_who_lose_a_parent_to_suicide_more_likely_to_die_the_same_way.

receive the mental health counselling he requires, especially following his release and while he is on supervision, which he will be for a considerable time.

> B. *Additional § 3553(a) factors.*

The sentencing factors under 18 U.S.C. § 3553(a)(2) address punishment, deterrence, incapacitation, and rehabilitation. *See Tapia v. United States*, 564 U.S. 319, 325 (2011). This Court is to determine a sentence that is sufficient, but not greater than necessary, to address these factors, "to the extent that they are applicable in light of all the circumstances of the case." *See* 18 U.S.C. §§ 3551(a), 3553(a); *Tapia*, 564 U.S. at 325. Under the circumstances discussed herein, a sentence of no more than 84 months will still promote the goals of retribution and incapacitation, and is thus a sentence that is sufficient but not greater than necessary under 18 U.S.C. § 3553(a).

A sentence below the Guidelines range is sufficient to address the seriousness of the offense and will balance the aggravating circumstances of the case as accounted for by the Sentencing Guidelines, with the mitigating specific offender characteristics discussed above. This sentence will certainly punish and incapacitate Mr. Rector and is sufficient to promote specific and general deterrence. Regarding specific deterrence, Mr. Rector has already been away from his family for nine (9) years while incarcerated. It is therefore unnecessary to impose a longer term of imprisonment for specific deterrence. Another sentencing factor for the Court to consider includes promoting respect for the law and protecting the public. However, treatment and education are more effective means to both protect the public and promote rehabilitation. This is particularly so here. As the Government acknowledges, Mr. Rector has reported some mental health issues for which he has not received treatment and he has expressed an interest in receiving treatment for longtime marijuana usage. ECF No. 74 at 4.

Mr. Rector has completed only limited business management course work and has very little employment experience. *Id.* This is not an instance, then, where treatment and education have failed the individual – they have not yet been attempted.

Section 3553(a) also admonishes courts to avoid unwarranted disparities. This concept has some tension with the well-established principle that sentencings should be individualized and tailored to the specific person under the specific circumstances. However, the Court is not to avoid *all* disparities, only *unwarranted* disparities. Viewing Mr. Rector's history as well as his involvement in this offense, a sentence of no more than 84 months with supervised release will not create any unwarranted disparity.

Mr. Rector is subject to at least four (4) years of supervised release, which will promote general and specific deterrence and will protect the public, as he will be supervised by a U.S. Probation Officer. Mr. Rector clearly has been exposed to significant trauma throughout his life, and he has not received appropriate trauma-informed and resilience-based treatment to heal from those experiences and the impact on his life. Congress has "recogniz[ed] that imprisonment is not an appropriate means of promoting correction and rehabilitation." *See* 18 U.S.C. § 3582(a). Thus, while the Bureau of Prisons has correctional and rehabilitative programs, incarceration will not serve to provide the appropriate, long-term rehabilitation that Mr. Rector needs to better ensure that he will never put himself in a situation like this again.

Supervision is also punitive, as the Supreme Court has recognized that it imposes a serious restriction on a person's liberty. *See Gall*, 552 U.S. at 48. Individuals under court supervision are "subject to several standard conditions that substantially restrict their liberty." *Id.*; *see also United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is

entitled.") (internal citation omitted). Should Mr. Rector violate the conditions of his supervised release, he is subject to additional imprisonment. Thus, when determining the appropriate length of imprisonment, it is necessary to consider all sentencing options at the discretion of this Court.

## CONCLUSION

While punishment is warranted in this case, it is not necessary to impose a sentence of imprisonment within the advisory Guideline range to address the purposes of sentencing. Indeed, given the history and characteristics of Mr. Rector and the direct impact of that history on his involvement in this offense conduct, a sentence within the Guidelines range is greater than necessary. Mr. Rector respectfully requests that this Court impose a sentence of not more than eighty-four (84) months' imprisonment to be followed by four (4) years of supervised release that includes a special condition of mental health treatment.

TREVON DERWIN RECTOR

By Counsel

MICHIEHAMLETT PLLC

By:   */s/ Rhonda Quagliana*
      Rhonda Quagliana, Esquire
      VSB #39522
      MichieHamlett PLLC
      310 4th Street NE, 2nd Floor
      P.O. Box 298
      Charlottesville, Virginia 22902
      (434) 951-7225
      (434) 951-7279 *facsimile*
      rquagliana@michiehamlett.com
      *Counsel for Defendant*

{01433874-13 }                              15

## CERTIFICATE OF SERVICE

      I hereby certify that on March 6, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following: counsel of record; and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

      */s/ Rhonda Quagliana*